# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LINDA G. HEARST, *Administratrix* of the ESTATE OF ROBERT W. HEARST, V., DECEASED,<br>　　　　　Plaintiff,<br><br>　　　v.<br><br>BRADLEY MASON, RON CHAPELL, BRIAN LAUVER, STEVE GAGE, JOHN DOE NO. 4 of McKean County Prison, and COUNTY OF MCKEAN,<br>　　　　　Defendants. | 1:11-cv-304 |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56 (ECF No. 27) filed by Defendants Bradley Mason ("Mason"), Brian Lauver ("Lauver"), Steve Gage ("Gage"), John Doe No. 4, and the County of McKean (the "County"), with brief in support (ECF No. 28). Linda G. Hearst ("Plaintiff"), the Administratix of the Estate of Robert W. Hearst, V. ("Decedent"), filed a brief in opposition (ECF No. 36). The factual record has been developed through Defendants' concise statement of material facts ("CSMF") (ECF No. 29), Plaintiff's responsive CSMF (ECF No. 35), and Defendants' reply to Plaintiff's CSMF (ECF No. 40). The Court heard oral argument from counsel on the motion on March 11, 2014. Accordingly, the motion is ripe for disposition.

### I.　　Background

#### A.　　Factual Background

This is a tragic case. Decedent was arrested in September 2009 and detained in the McKean County Jail ("Jail") after not having posted bail. The next month, Decedent received a disciplinary infraction and as a result was transferred out of the general Jail population and into

1

an isolation cell. He remained in the isolation cell until he committed suicide in December 2009.

On the night of December 8 into the early morning of December 9, corrections officers Lauver, Chapell, and Gage were assigned to the unit in which Decedent's cell was located. Around midnight, while making his rounds, Chapell observed the Decedent awake in his cell with the lights on. Around the same time, Lauver walked by and observed the Decedent at a table in his cell either reading or writing in a notepad. At approximately 1:20 or 1:30 a.m., Gage noticed that Decedent was still awake at his table. This was the last time Decedent was seen alive. Between this time and 5:08 a.m., the three officers continued to make rounds every 15 to 20 minutes. They did not, however, actually look through Decedent's cell window or make any other efforts to observe Decedent in his cell. They testified that the lights in Decedent's cell were off throughout the night, and they did not believe that anything unusual was going on.

At approximately 5:08 a.m., Chapell and Lauver approached Decedent's cell to give him his morning medications.[1] Lauver had the control room operator open the cell door, entered the cell, and discovered Decedent hanging from the top bunk of his bed by a noose fashioned from a bed sheet. Upon discovering Decedent, Lauver turned around and asked Chapell to come into the cell. When Chapell entered, he called out Decedent's name and got no response. He also checked for a pulse and felt no heartbeat. The officers then tried to untie the sheet from around

---

[1] Plaintiff suggests that because the Medication Administration Record ("MAR") from December 9 contains Chapell's initials, he must have actually given Decedent his medication sometime before 5:08 a.m. The upshot, Plaintiff contends, is that Decedent could have still been alive a couple of minutes before he was discovered hanging, which increases the likelihood that he would have survived had Defendants performed CPR. However, Chapell has clarified the sequence of events in an affidavit attached to Defendants' reply to Plaintiff's responsive CSMF (ECF No. 41). According to Chapell, as he waited for Gage to open Decedent's cell door from the control room, he prepared Decedent's medications by placing them into a cup. Then he initialed the MAR form. But because Decedent was discovered hanging, the medications were never actually administered to him. Therefore, Chapell maintains that Decedent was last seen alive at approximately 1:30 a.m., and not any later that morning.

Decedent's neck. When that failed, Lauver left the cell to retrieve a cutting tool from the control room, where Gage was stationed throughout the incident. (Gage testified that he was required to remain in the control room at all times, as the room could not be left unattended.) Meanwhile, Chapell left the cell to call 911. He also notified Warden Mason, the State Police, and certain unnamed assistant wardens. Shortly thereafter, Lauver returned to the cell, cut the sheet down, and lowered Decedent's body to the floor.

At the time, the Jail's Suicide Prevention and Intervention Program Policy provided, in pertinent part, that any staff member who discovers an inmate attempting to commit suicide or who has attempted suicide should "<u>never</u> wait for medical personnel to arrive before entering a cell or before initiating appropriate life saving measures, (i.e., first aid and CPR)." Defs.' Ex. Q at 7 (ECF No. 32-17) (emphasis in original). The policy also provided that

> [u]pon entering the cell or other inmate living area, correctional staff will never presume that the victim is dead. Rather, life saving measures will be initiated immediately . . . Should the victim lack vital signs, correctional officer or other staff will initiate CPR until relieved by medical personnel.

*Id.* The Jail also had a policy for dealing with unresponsive inmates, which required an officer, "[u]pon discovery of an unresponsive inmate (believed to be expired)," to "begin applicable first aid or CPR procedures." Defs.' Ex. R at 1 (ECF No. 32-18). Defendants Lauver, Chapell, and Gage each testified that they had received training on or at least been instructed to read these policies.[2]

Nevertheless, after cutting Decedent down, neither Lauver nor Chapell attempted to

---

[2] Plaintiff disputes that any of these officers were trained on the Suicide Prevention and Intervention Program Policy, Policy IHC-800, which had been in effect since January 2009, until four months after Plaintiff's suicide. For their part, Defendants contend that although they were not trained on the 2009 version of the policy until after Decedent's suicide, they had received training and instruction on the 2005 version of the policy, which was, for all intents and purposes, the same as the 2009 version.

3

perform CPR, though they were trained to do so. Nor did either of them retreive the automatic external defibrillator ("AED") from the nearby control room. Lauver testified that he did not attempt to administer aid "[b]ecause it was very obvious that it was well beyond that point . . . [Decedent] was blue and cold and, you know, stiff at that point." Lauver's Dep. at 35:5-9 (ECF No. 32-11). Likewise, Chapell testified that he thought (wrongly) that he had the ability under the Jail's policies to make a determination as to whether to attempt CPR. Because "[t]here were no signs of life" when Chapell entered the cell, "[he] presumed [Decedent] was dead." Chapell's Dep. at 12:13-14 (ECF No. 32-10). Chapell also testified that Decedent's skin was cold to the touch and "tight," and his neck, face, and arms had turned a purplish color. *Id.* at 19:4-17. Thus, he believed Decedent was beyond resuscitation. Plaintiff disputes that Decedent's body was cold at this time and notes that the autopsy report indicated that Decedent's body was still "slightly warm" approximately nine hours after it was found.

An emergency medical technician ("EMT") arrived at the Jail at 5:22 a.m. At that time, the scene was being processed by the State Police, so the EMT was not given immediate access to Decedent's body, which remained in the cell. The EMT was able to see the body from a distance, however, and observed deep cyanosis from the head to shoulders and dependent lividity along the left side of Decedent's body.[3] When the EMT was permitted to enter the cell at approximately 5:27 a.m., he did not attempt to administer CPR. The County coroner pronounced Decedent dead soon thereafter, listing the time of death as 5:28 a.m.

---

[3] While the narrative contained within the EMT's report is hearsay, it would be admissible at trial under the business records exception in Fed. R. Evid. 803(6). *See Allen v. Fletcher*, No. 07-722, 2009 WL 3103828, at *3 (M.D. Pa. Sept. 24, 2009). Thus, the Court may consider the content of the report in deciding the pending motion for summary judgment. *See Huey v. Walgreen Co.*, No. 09-0209, 2010 WL 3825676, at *9 n.3 (D. Del. Sept. 23, 2010) (concluding that a court may consider admissible hearsay in deciding a motion for summary judgment).

4

## B. Procedural History

Plaintiff, as the Administratrix of Decedent's Estate and on behalf of herself and Decedent's three minor children, initiated this action under 42 U.S.C. § 1983 on December 7, 2011, by filing an 11-count Complaint against Warden Mason, John Does Nos. 1 through 4, and McKean County (ECF No. 1). On February 7, 2012, Defendants filed a motion to dismiss the entire action on a number of grounds (ECF No. 5). After hearing oral argument on the motion, former Chief United States District Judge Sean McLaughlin dismissed all of the claims brought on behalf of the Decedent's minor children, but he allowed the remainder of the claims to proceed.

On November 14, 2012, Plaintiff filed a two-Count Amended Complaint against Mason, Chapell, Lauver, Gage, John Doe No. 4,[4] and the County, alleging that the corrections-officer Defendants were deliberately indifferent to Decedent's serious medical needs, in violation of the Fourteenth Amendment, by failing to take the necessary precautions to prevent Decedent from having committed suicide and by failing to attempt CPR upon having found him hanging in his cell. She also alleges that Mason and McKean County failed to properly train corrections officers regarding the Jail's suicide prevention and unresponsive inmate policies. Count I is a wrongful death action pursuant to 42 Pa. C.S.A. § 8301, in which Plaintiff seeks damages for funeral bills and other items connected with Decedent's death including loss of earnings, support, companionship, services, society, and comfort. Count II is a survival action pursuant to 20 Pa. C.S.A. § 3373 and 42 Pa. C.S.A. §8302, in which Plaintiff seeks damages for the pain and suffering, loss of earning capacity, loss of life, and loss of life's pleasures experienced by Decedent. After the close of discovery, Defendants filed this motion for summary judgment

---

[4] John Doe No. 4 has never been identified, and Plaintiff agrees that the claim against him should be dismissed.

5

which seeks to dismiss both Counts of the Amended Complaint.

## II. Standard of Review

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986). The nonmoving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Liberty Lobby*, 477 U.S. at 249). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Distilled to its essence, the summary judgment standard requires the nonmoving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251-52.

## III. Discussion

Plaintiff has agreed to limit her Fourteenth Amendment "claims to Defendants' failure to attempt CPR or other life-saving measures when they discovered Decedent hanging by a bed sheet in his cell at approximately 5:08 a.m. on December 9, 2009, and to the allegation that this failure was pursuant to a policy and/or failure to train" on the part of Warden Mason and McKean County. (ECF No. 33). Each of the Defendants has moved for summary judgment. The Court will first address the claims against the corrections-officer Defendants and then turn to the derivative claims against Warden Mason and McKean County.

### A. Officer Gage

Gage argues that he is entitled to summary judgment because there is no evidence of his personal involvement in the alleged occurrence of a constitutional violation. It is undisputed that Gage remained in the control room when Lauver and Chapell discovered Decedent's body, as he was required to do under the policies of the Jail. Plaintiff contends that Gage should have nonetheless demanded that Lauver and Chapell immediately begin CPR and "[n]ot having done so, [he] was equally guilty . . . ." Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J. at 6 (ECF No. 36). This argument is not sound. Assuming that Plaintiff could establish a constitutional violation, the theory espoused by Plaintiff against Gage is too attenuated to impose liability on him. *Cf. Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997), o*verruled in part on other grounds by Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006) ("As a general matter, a person who fails to act to correct the conduct of someone over whom he or she has no supervisory authority cannot fairly be said to have 'acquiesced' in the latter's conduct."). Therefore, judgment will be entered in favor of Gage.

### B. Officers Lauver and Chapell

Lauver and Chapell argue that there is not sufficient evidence to establish that they acted with deliberate indifference when they discovered Decedent hanging and did not perform CPR on him. They also contend that they are entitled to qualified immunity.

Government officials are entitled to qualified immunity "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The doctrine "balances two important

interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Messerschmidt v. Millender*, --- U.S. ----, 132 S. Ct. 1235, 1245 (2012) (internal quotation marks omitted). "[A]ll but the plainly incompetent or those who knowingly violate the law" will be protected from liability. *Id.* (internal quotation marks omitted). In deciding whether an official is entitled to immunity, the Court must ask (1) whether the official's conduct violated a constitutional right; and if so, (2) whether that right was "clearly established . . . in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from by Pearson*, 555 U.S. 223. The Court has the discretion to consider these two prongs in any order. *Id.* at 236.

Before doing so, however, the Court will first consider the importance of the manner in which Plaintiff has pled this action, insofar as this consideration will frame the Court's discussion of the substantive claims raised by Plaintiff. Count I is labelled a wrongful death action brought under Pennsylvania law.[5] The Wrongful Death Statute of Pennsylvania permits certain designated representatives to bring a cause of action "to recover damages for the death of an individual caused" by the wrongful act of another. 42 Pa. C.S.A. § 8301. The statute is designed to compensate a decedent's relatives "for the pecuniary loss in the form of lost earnings occasioned by the death, as well as services the decedent would have performed for the family."

---

[5] The Court notes that there is "considerable debate" among the various Courts of Appeals with respect to "[t]he right to wrongful death recovery under § 1983." *Carringer v. Rodgers*, 331 F.3d 844, 850 n.9 (11th Cir. 2003). Our Appellate Court has not waded into this debate, and neither has the United States Supreme Court. Although the Circuits have embraced at least four different theories to decide whether claims for wrongful death can proceed under § 1983, *id.*, the majority approach requires the court to "borrow" the law of the forum state on wrongful death actions insofar as it is not inconsistent with the dual purposes of § 1983: compensation and deterrence, *see* Daniel E. Feld, *Survivability of Civil Rights Cause of Action Based on 42 U.S.C.A. § 1983*, 42 A.L.R. Fed. 163 (originally published 1979) (collecting cases).

*Hickenbottom v. Nassan*, No. 03–223, 2007 WL 7753803, at *38 (W.D. Pa. Mar. 29, 2007) (internal quotation marks omitted). Importantly, a "wrongful death action cannot be maintained unless the defendant's conduct is the cause of the decedent's death." *Phillips ex rel. Phillips v. Monroe Cnty.*, 311 F.3d 369, 374 (5th Cir. 2002) (citing Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation § 4:67 (4th ed., 2001 update)). Thus, "a plaintiff seeking to recover on a wrongful death claim under § 1983 must prove both the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute." *Id.* Count II of the Complaint, on the other hand, is labelled a survival action.[6] Unlike a wrongful death action, "[a] survival action is not a new cause of action occasioned by an individual's death, but is one that accrues during an individual's lifetime that survives his or her death." *Massey v. Fair Acres Geriatric Cntr.*, 881 F. Supp. 2d 663, 670 (E.D. Pa. 2012) (citing 42 Pa. C.S.A. § 8302). As such, "[t]he recovery of damages stems from the rights of action possessed by the decedent at the time of death" and available damages are limited to those incurred "between the time of injury and death." *Id.* (internal quotation marks omitted).

With that background as stated, the Court turns to the claims against Lauver and Chapell—the threshold issue being whether Plaintiff has shown that a constitutional violation occurred under this factual scenario. This "is not a question of immunity, but whether there is any wrong to address." *Ray v. Twp. of Warren*, 626 F.3d 170, 174 (3d Cir. 2010).

Plaintiff was a pretrial detainee at the time of his suicide. Since the Decedent had not yet

---

[6] As is the case with wrongful death actions, "the survival of civil rights actions under § 1983 upon the death" of a plaintiff is an area not covered by federal law. *Robertson v. Wegmann*, 436 U.S. 584, 587 n.3 (1978). Accordingly, pursuant to 42 U.S.C. § 1988, district courts must look at the forum state's law of survivorship to determine whether a decedent's cause of action abates with his death. *Id.* at 589-90. Insofar as the state law is not inconsistent with § 1983, it should be applied. *Id.*

been convicted of any crime at the time of his death, the Eighth Amendment did not apply to him. *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)). As a pre-trial detainee, however, he was entitled to protection under the Due Process Clause of the Fourteenth Amendment, which *inter alia* requires the government to provide adequate medical care for a detainee's serious medical needs. *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993) (citation omitted). The Third Circuit Court of Appeals has looked to its Eighth Amendment case law "in developing its jurisprudence on pre-trial detainee suicides" since the amount of protection accorded under each Amendment is the same. *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 n.5 (3d Cir. 2005). Therefore, Plaintiff's Fourteenth Amendment claim must be analyzed with reference to the standard established for Eighth Amendment claims. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

In order to prove a constitutional violation in this context, Plaintiff must show that (1) Decedent had a serious medical need, and (2) Lauver and Chapell were deliberately indifferent to that need. *Id.* A government official is deliberately indifferent if he knows that there is "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). This is a high standard, which requires a showing of more than negligence or even gross negligence. *Haines v. Forbes Rd. Sch. Dist.*, No. 07-00852, 2009 WL 89323, at *5 (M.D. Pa. Jan. 13, 2009). That is, it is not enough that the defendant should have been aware of the risk but failed to notice it. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2011). Defendant must actually know of the risk and choose not to act. *Id.* Furthermore, it is important to recognize that proving a violation of the internal policies of the Jail for handling detainee suicides is insufficient, standing alone, to amount to deliberate

indifference. *See Falls v. Nesbitt*, 966 F.2d 375, 380 (8th Cir. 1992) ("Our decision today stands for the proposition that a prison official's violation of an internal regulation does not give rise to an Eighth Amendment claim of 'cruel and unusual punishment,' in the absence of objective evidence demonstrating that prison officials were deliberately indifferent to a prisoner's constitutional rights[.]"); *DesRosiers v. Moran*, 949 F.2d 15, 21 (1st Cir. 1991) ("Not every breach of prison regulations will give rise to an Eighth Amendment claim. What counts is whether the official conduct of which the plaintiff complains was in derogation of the constitutionally mandated 'deliberate indifference' standard.").

Plaintiff contends that Defendants acted with deliberate indifference by failing to perform CPR, despite knowing that Decedent was not breathing and not knowing how long he had been in such a state. As Plaintiff asserts, a few federal appellate courts have held that "failing to provide CPR or other life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference." *Lemire v. Cal. Dept. of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013) (citing *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009); *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008); *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005); *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001)). Those cases are distinguishable from this case, however. In each of those cases, there was some indication in the record that the inmate had very recently stopped breathing or was otherwise in need of urgent care, but the defendants ignored those signs of life and chose not to perform life-saving measures. *See, e.g.*, *McRaven*, 577 F.3d at 979 (officer observed a weak pulse but still failed to perform CPR); *Jones*, 521 F.3d at 558 (officers sprayed chemical irritant in plaintiff's face, left him face down on the ground, and failed to aid him, although he was not breathing); *Bozeman*, 422 F.3d at 1268-69 (officers were involved in a scuffle with inmate, which left inmate

unconscious, but officers nonetheless failed to try to aid him). None of those cases involved situations, where, as here, the defendants believed, based on the evidence available to them at the time, that the inmate had been deceased for some time and thus life-saving measures would have been futile.

This is a critical distinction, as courts in a number of cases have recognized. For example, in *Brumfield v. Hollins*, 551 F.3d 322, 333 (5th Cir. 2008), a case with facts virtually indistinguishable from the facts in this case, the plaintiff alleged that the defendants failed to undertake life-saving procedures on her son when they found him hanging in his cell, thereby violating his right to reasonable medical care. Upholding the district court's decision to grant summary judgment to the defendants, the Fifth Circuit Court of Appeals explained,

> [t]he facts at issue here are undoubtedly tragic—the deputies saw Smith lying on the floor in his cell; three different people felt for a pulse, found none and assumed Smith was dead; they neither removed the shoestring noose from Smith's neck nor attempted to resuscitate him; they took pictures of Smith's body and the scene of the suicide; and twenty minutes elapsed before the ambulance crew arrived, removed the noose from Smith's neck, and began life-saving techniques. While the deputies' conclusion that Smith was already dead and their resulting failure to make any attempt to save Smith's life are arguably negligent, negligent conduct alone does not amount to deliberate indifference.

*Id.* at 333.

Similarly, in *Ward v. Holmes*, 28 F.3d 1212 (4th Cir. 1994) (unpublished), the inmate was last seen alive in his cell at 4:14 p.m. *Id.* at *2. At 4:37 p.m., corrections officers found him hanging from the top bunk of his bed. *Id.* According to the officers' testimony, the inmate's "color was poor; his fingers were a dark blue, purplish color; and his body felt cool to the officers." *Id.* Thus, "[t]hey concluded that he was dead and did not begin [CPR]." *Id.* The court concluded that the defendants were not deliberately indifferent in failing to do so:

> Based on the absence of pulse and respiration, in combination with [the inmate's] appearance and the temperature of his body, [defendants] believed that [the

> inmate] was dead . . . Because the officers believed that [the inmate] was dead, their failure to attempt to resuscitate him was at most negligent.

*Id.* at *7.

The District Court for the District of South Carolina reached the same result in *Clinton v. County of York*, 893 F. Supp. 581 (D.S.C. 1995), another case with facts almost identical to those here. In *Clinton*, upon discovering the inmate, the corrections officers cut him down and laid him on a mattress pad. *Id.* at 583. Then they checked for a pulse and vital signs—to no avail. *Id.* Presuming the inmate to be dead, they called for an ambulance but did not perform CPR. *Id.* When the paramedics arrived, they also found no signs of life. *Id.* Adopting the rationale from *Ward*, the court held that the corrections officers' conduct "was, at most, negligence, not deliberate indifference." *Id.* at 586-87.

Likewise, in *Monzon v. Parmer County*, No. 06-39-J, 2007 WL 1732384, at *6 (N.D. Tex. 2007), the corrections officers came upon an inmate who was not breathing and had no discernible pulse. *Id.* at *2. According to the officers, the inmate also "was cold and stiff; his tongue stuck out partially; his teeth were closed down on his tongue; and his jaws were locked." *Id*. Feeling "positive that [he] was dead, that he had been for some time, and that there was no chance to resuscitate," the officers declined to try CPR. *Id.* In granting summary judgment for the officers, the court explained that they could not have actually inferred a substantial risk of serious harm or subjectively intended that the decedent suffer any harm, as is necessary to impose liability, because they "felt positive that he was dead." *Id.* "At worst," the court concluded, "[the officers] acted negligently." *Id.*

This line of cases is highly instructive. Read together, these cases suggest that a claim for failing to initiate CPR to an inmate who is seemingly unconscious and not breathing will not lie if the evidence indicates that the inmate had been deceased for a considerable amount of time or

other signs reasonably point to the conclusion that resuscitation efforts would not have been effective. Stated another way, there must be some evidence suggesting that the inmate is resuscitable at the time he is discovered, which contradicts or calls into question the officer's statement about his belief that the inmate was deceased. *See Reed v. Woodruff Cnty.*, 7 F.3d 808, 811 (8th Cir. 1993) (concluding that plaintiff's deliberate indifference claim was properly dismissed where there was no evidence that an attempt to perform CPR could have revived inmate); *DiPace v. Goord*, 308 F. Supp. 2d 274, 284 (S.D.N.Y. 2004) (citations omitted) (observing that "it would be reasonable to conclude today that prison officials have a duty to administer life-saving care even in the absence of a pulse or respiration where circumstances indicate the possibility of a very recent death . . ."); *see also Owens v. City of Philadelphia*, 6 F. Supp. 2d 373, 385 (E.D. Pa. 1998) (permitting deliberate indifference claim to survive summary judgment where inmate was discovered hanging only 30 minutes after he was last seen alive and there was no evidence of "whether [he] was still alive and resuscitable" when discovered). Only then could a reasonable jury reach the conclusion that a defendant was subjectively aware of the danger in which an inmate found himself and, in turn, deliberately indifferent in failing to take action to abate that danger.

Plaintiff argues strenuously that she need not come forward with any evidence that Decedent was alive or could have survived had Defendants attempted to perform CPR. At oral argument, for example, Plaintiff's counsel attempted to reframe the argument by contending that the issue is "not whether or not [Decedent] would have survived," but rather "whether or not [Decedent] had the constitutional right to be given the opportunity to survive and whether these officers or guards had the constitutional duty to try." Plaintiff's counsel also maintained that any evidence related to whether Decedent was alive or could have been resuscitated is irrelevant to

14

the issue of liability, but may be relevant to the issue of damages. The Court cannot agree with these contentions.

First of all, Plaintiff has not directed the Court's attention to any authority suggesting that Decedent had an independent, federally protected right to have an "opportunity to survive." Rather, Decedent had the right to receive adequate medical care for his serious medical needs while in the custody of the County. If he was already dead with no chance of survival when Defendants' came upon him, that right had been extinguished. *See Whitehurst v. Wright*, 592 F.2d 834, 840 (5th Cir. 1979) ("After death, one is no longer a person within our constitutional and statutory framework, and has no rights of which he may be deprived."). Second, this argument must be more properly viewed as addressing the issue of causation—an essential element of Plaintiff's wrongful death claim—and not the issue of damages, as Plaintiff's counsel claimed at oral argument. As previously discussed, in order to recover for the wrongful death of her son, Plaintiff must show that the alleged constitutional violation *caused* her son's death. The lack of evidence to indicate that Decedent was still alive or deceased for less than 20 to 30 minutes (*i.e.*, the time frame within which Plaintiff's expert, Dr. Richard O. Cummins, opined that resuscitation efforts could succeed) when he was discovered after having hanged himself would make it impossible for a reasonable jury to find for Plaintiff on the wrongful death causation element. Any such finding would be based purely on speculation as to when Deceased died and whether life-saving measures would/could have been effective.

Without actually saying so (and without citing any authority in support), Plaintiff is essentially asking this Court to adopt the "loss of chance" or "lost chance" doctrine that some jurisdictions apply in the medical negligence realm. *See, e.g.*, *Herber v. Johns-Manville Corp.*, 785 F.2d 79, 82-83 (3d Cir. 1986) ("Under the lost chance doctrine, a plaintiff can recover for

damage suffered as the result of nonfeasance that reduced the probability of avoiding an injury actually sustained."); *Beswick v. City of Philadelphia*, 185 F. Supp. 2d 418, 434 (E.D. Pa. 2001) ("Under [the lost chance] theory, the burden of proof for causation is not changed; rather, the injury is defined as the loss of chance itself, as opposed to the resultant harm to the plaintiff."). However, the Court is unaware of any cases from this Circuit which have applied this doctrine in the context of a § 1983 claim. Notably, cases from outside the Third Circuit have expressly declined to extend the loss of chance rule into this realm. *See, e.g.*, *Phillips*, 311 F.3d at 375 (citation omitted). Furthermore, even if the doctrine were applicable, Plaintiff would still have to introduce competent medical evidence regarding what Decedent's chance of survival would have been had Defendants not decided against performing CPR. The only evidence Plaintiff has offered on this point is the hypothetical statement of her expert, Dr. Cummins, suggesting that "if the hang time had been less than 20 to 30 minutes," CPR would have more likely than not been effective. This evidence would not be sufficient to send Plaintiff's claim for wrongful death to a jury, even under the loss-of-chance doctrine.

In summary, the facts of this case are without question tragic. Decedent's surviving family members, in their quest for answers, understandably want to believe that if the Defendants Lauver and Chapell had attempted to administer aid, their loved one *could* still be alive. By Defendants' own admission, everything that could have been done to determine whether Decedent had the chance to survive was not done. Indeed, the Jail's own policies required more. Yet, while Defendants' conduct was arguably negligent, it did not amount to deliberate indifference. When they entered the cell, all signs pointed to the conclusion that Decedent was already dead and had been for some time. Other evidence in the record—specifically, the ambulance report which indicated that cyanosis and livor mortis had set in and the opinion of

Defendants' expert, Dr. Eric Lee Vey—supports that assumption. According to Dr. Vey's report, livor mortis typically develops at one to two hours after death, which is far beyond the point at which even Plaintiff's expert opined that CPR could have been effective. For her part, Plaintiff has not offered anything to controvert these facts. Without having done so, she cannot establish that the conditions were such that Lauver and Chapell must have been aware that there was a chance that Decedent could have been revived but still failed to act—saying that they should have known better is not enough to establish deliberate indifference. *See Reed*, 7 F.3d at 811. Consequently, there is no basis to find that Lauver and Chapell violated Decedent's Fourteenth Amendment rights.[7] There is also no basis upon which a jury could find that Decedent's death was caused by Defendants' inaction. Accordingly, because Plaintiff has not made out a violation of Decedent's constitutional rights, Lauver and Chapell are entitled to qualified immunity, and their motion for summary judgment will be granted.[8]

### C. Warden Mason and the County

Insofar as Plaintiff cannot establish an underlying violation of Decedent's constitutional rights, there is no basis to hold either Mason or McKean County liable on a failure-to-train theory. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (explaining that nothing "authorizes the award of damages against a municipal corporation based on the actions of one of

---

[7] The Court acknowledges Plaintiff's argument that Defendants should not be able to insulate themselves from liability simply on the basis of their own belief that Decedent would not have benefitted from receiving CPR. Of course, in some cases it would be inappropriate to grant summary judgment on the basis of a defendant's assertions of his state of mind. *See Lemire*, 726 F.3d at 1083 (citation omitted). But this is not one of them, as Plaintiff has provided no evidence to contradict Defendants' statements or to suggest that Decedent was not beyond the point of resuscitation when he was discovered. *See id.*

[8] Plaintiff's conspiracy claim against Gage, Lauver, and Chapell premised on the same alleged underlying constitutional violation likewise cannot survive Defendants' motion for summary judgment. *See White v. Brown*, 408 F. App'x 595, 599 (3d Cir. 2010) ("[T]he District Court properly granted summary judgment on [plaintiff's] conspiracy claims because [he] cannot establish an underlying violation of his constitutional rights.").

its officers when in fact the jury has concluded that the officer inflicted no constitutional harm"); *Mills v. City of Harrisburg*, 350 F. App'x 770, 773 n.2 (3d Cir. 2009) (holding that "[a]bsent an underlying constitutional violation by an agent of the municipality, however, the municipality itself may not be held liable under § 1983"); *Verbanik v. Harlow*, No. 09-448, 2012 WL 4378198, *9 (W.D. Pa. Sept. 25, 2012), *aff'd*, No. 12-3887, 2013 WL 310237 (3d Cir. Jan. 28, 2013) (concluding that "the absence of an underlying constitutional violation precludes any supervisory liability on a 'knowledge or acquiescence' or 'failure to train' theory") (citations omitted). Therefore, the Court will grant the motion for summary judgment as to Warden Mason and McKean County.

## IV. Conclusion

For the reasons hereinabove stated, the Court will grant the motion for summary judgment in its entirety. An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LINDA G. HEARST,** *Administratrix* of the ESTATE OF ROBERT W. HEARST, V., DECEASED, <br>       **Plaintiff,** <br><br> v. <br><br> **BRADLEY MASON, RON CHAPELL, BRIAN LAUVER, STEVE GAGE, JOHN DOE NO. 4 of McKean County Prison, and COUNTY OF MCKEAN,** <br>       **Defendants.** | 1:11-cv-304 |

## ORDER OF COURT

**AND NOW**, this 24th day of March, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED** and **DECREED** that, upon consideration of the MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56 (ECF No. 27) filed by Defendants Bradley Mason, Ron Chapell, Brian Lauver, Steve Gage, John Doe No. 4, and the County of McKean and Plaintiff Linda G. Hearst's response thereto (ECF No. 36) and after having heard oral argument from counsel thereon, Defendants' Motion for Summary Judgment is **GRANTED**.

Judgment will be entered in favor of Defendants and against Plaintiff. The clerk shall thereafter docket this case closed.

                     BY THE COURT:

                     s/Terrence F. McVerry
                     United States District Judge

cc:  **Michael Louik, Esquire**
    Email: mlouik@caringlawyers.com

    **Patrick M. Carey, Esquire**
    Email: pmcarey@mdwcg.com